Randy McDonald, 032008
Colin M. Proksel, (*Pro hac vice* application forthcoming)
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona  85012-2793
(602) 640-9000
rmcdonald@omlaw.com
cproksel@omlaw.com

*Attorneys for Dr. DeShawn Taylor*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| DR. DESHAWN L. TAYLOR, | ) | No. |
| | ) | |
| Movant, | ) | |
| | ) | **EMERGENCY MOTION OF** |
| vs. | ) | **NON-PARTY DR. DESHAWN** |
| | ) | **TAYLOR TO QUASH** |
| KEN PAXTON, ATTORNEY GENERAL | ) | **DEPOSITION SUBPOENA** |
| OF TEXAS, | ) | **OR, IN THE ALTERNATIVE,** |
| | ) | **FOR A PROTECTIVE ORDER** |
| Respondent. | ) | |

Dr. DeShawn Taylor, a non-party, by her undersigned counsel, hereby moves – on an emergency basis – to quash the Deposition Subpoena issued by the office of Ken Paxton, the Attorney General of Texas, to Dr. Taylor to take her deposition on October 4, 2017, in Phoenix, Arizona, in the matter captioned *Whole Woman's Health, et al. v. Ken Paxton, et al.*, No. 1:17-CV-00690, pending in the United States District Court for the Western District of Texas (the "Subpoena" and the "Texas Litigation," respectively).  As will become apparent, Dr. Taylor has no direct, personal knowledge of any matter that could possibly be relevant in the Texas Litigation.  Rather, this and other subpoenas issued by Respondent in this matter appear to be part of a systematic campaign of harassment against a class of doctors who provide abortion services outside of Texas but who have been caught on surreptitious – and illegal – recordings having conversations that obliquely reference the procedure at issue in the Texas Litigation.

Accordingly, any deposition of Dr. Taylor in this matter would be unduly burdensome. Furthermore, the deposition would likely require the disclosure of privileged or otherwise confidential information relating to Dr. Taylor's treatment of her patients. Finally, Respondent has not provided Dr. Taylor a reasonable time within which to comply.

Before filing this Motion, pursuant to Local Rule 7.2(j), counsel for Dr. Taylor conferred with counsel for Respondent and were unable to satisfactorily resolve the matter.  A Certification of Good Faith Consultation is attached as **Exhibit 1**.

This Motion is supported by the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

#### A.    Dr. Taylor is an Arizona doctor who has never practiced in Texas.

Dr. Deshawn L. Taylor is an obstetrician-gynecologist who founded and operates her own practice in Phoenix, Arizona.  She received her medical degree from the David Geffen School of Medicine at the University of California, Los Angeles, in 2001.  Dr. Taylor is board certified by the American Board of Obstetrics and Gynecology.  She has been licensed to practice in Arizona since 2009.  Dr. Taylor is a former medical director of Planned Parenthood Arizona, a positon she left in 2013.  At various times in her career, Dr. Taylor has work for or with Planned Parenthood or its affiliates in California, Arizona, and Nevada – but not Texas.  Dr. Taylor is not licensed in Texas, nor has she ever worked in Texas.

#### B.    The Texas Litigation involves parties unrelated to Dr. Taylor and concerns factual issues of which she has no personal knowledge.

In the Texas Litigation, seven healthcare entities and four individual physicians (the "Plaintiffs") filed suit against Respondent and others in August 2017, challenging certain provisions of a Texas law, S.B. 8, which was enacted during the 2017 legislative

2

session, that bans "dismemberment abortions."[1] A copy of the Amended Complaint, the operative complaint in the Texas Litigation, is attached hereto as **Exhibit 2**.

The Plaintiffs in the Texas Litigation allege that D&E – the procedure that appears to be the target of S.B. 8 – is "the safest and most common method of abortion after approximately 15 weeks of pregnancy," or during the second trimester. *Id.* They argue that a ban on D&E "imposes an undue burden on women seeking second-trimester abortions" and "violates Plaintiffs' patients' right to bodily integrity because it would require them to accept unnecessary, invasive, and potentially painful medical procedures, in order to access their constitutional right to abortion." *Id.* The Plaintiffs sought, among other things, temporary injunctive relief while seeking to have S.B. 8 declared unconstitutional. *Id.*

On August 31, 2017, the Western District of Texas granted Plaintiffs a temporary restraining order ("TRO"). A copy of the TRO is attached hereto as **Exhibit 3**. In part, the Court found that Plaintiffs had shown a substantial likelihood of success on the merits:

> The act bans the most common and accepted medical procedure for second-trimester abortions—performance of the standard D&E before fetal demise. The parties disagree about whether the medical options available to a physician to cause fetal demise before performing the evacuation phase of the standard D&E abortion would, as a practical matter, force a woman and her physician to terminate her pregnancy by methods more risky and dangerous to the woman's health than the outlawed procedure.

> The State's interest notwithstanding, this court finds no authority for holding that government-mandated medically unnecessary, untested, or a more invasive procedure, or a more complicated and risky procedure with no proven medical benefits over the safe and commonly used banned procedure, is a permissible means of regulating previability abortions. . . .

---

[1] "Dismemberment abortion" is not a term used by any medical professional. It is a made-up term that appears to describe a procedure known as Dilation and Evacuation ("D&E"). *See* Exhibit 2.

*Id.* at 13-14 (citations omitted).

> **C.    Respondent issues this Subpoena – and others – without fully understanding why.**

On September 20, 2017, Adam A. Biggs, an Assistant Attorney General in the Texas Attorney General's office, served counsel for Dr. Taylor with the Subpoena, per agreement of the parties.  A copy of the Subpoena is attached hereto as **Exhibit 4**. Christopher Hilton, another Assistant Attorney General in the Texas Attorney General's office, spoke with counsel for Dr. Taylor after the Subpoena was served.

On September 25, 2017, the parties conferred and counsel for Dr. Taylor informed Mr. Hilton that Dr. Taylor was not currently affiliated with any party in the Texas Litigation, had never worked for any party in the Texas Litigation, and that she had never actually practiced or otherwise worked in Texas.  Given this background, counsel for Dr. Taylor asked Mr. Hilton to explain why Respondent sought her deposition testimony.

Mr. Hilton was only able to provide two reasons.  First, he stated that Dr. Taylor was knowledgeable about the services provided by Plaintiffs in the Texas Litigation. When asked how Dr. Taylor's general obstetrician-gynecologist work made her relevant to the Texas Litigation and whether there was any reason that Dr. Taylor in particular was needed, Mr. Hilton merely reiterated that she knowledgeable about the services provided by Plaintiffs.  Second, Mr. Hilton stated that Dr. Taylor had made certain statements "on the record" concerning procedures that may be at issue in the Texas Litigation.  When asked what statement or statements to which he was referring, Mr. Hilton simply told counsel for Dr. Taylor to "google" her.  He declined to further identify these statements – either as an exercise in obfuscation or because he himself was also unfamiliar with the statements.

Mr. Hilton declined to cancel Dr. Taylor's deposition.  He expressed a willingness to reschedule the deposition to accommodate Dr. Taylor's schedule, but

4

only so long as it could occur in early October.  Mr. Hilton said that he was currently coordinating several other subpoenas similar to the one at issue here, and that he would need to squeeze all of these depositions in before November, which was the deadline set by the Western District of Texas.   In subsequent communications, counsel for Dr. Taylor proposed two alternative dates for the deposition – October 25th and October 18th – but neither was acceptable to Mr. Hilton, who said only that "[a] depo date during the week of October 9th *might* be doable."  *See* email communication between parties, attached hereto as **Exhibit 5** (emphasis added).

### D.    Respondent tells Dr. Taylor's counsel to "Google" her.

Following Mr. Hilton's advice, counsel for Dr. Taylor "googled" her.  The most public information about Dr. Taylor via Google concerns a video in which an unidentified, undercover individual, who is affiliated with an entity that calls itself "The Center for Medical Progress" ("CMP") engaged Dr. Taylor in a conversation about abortion and surreptitiously –and without Dr. Taylor's consent – videotaped the conversation.  The video purports to have been taken in October 2014 at a Planned Parenthood conference in Los Angeles, California, but was not released until March 29, 2017.  Various versions of the video have been edited, and none appear to have been authenticated.

This video, along with others taken covertly by The Center for Medical Progress, has been the focus of cases in California state and federal courts.  For example, in *National Abortion Federation v. Center for Medical Progress, et al.*, No. 15-cv-03522 (N.D. Cal.), the court held CMS in civil contempt for violating a preliminary injunction, which prohibited CMS from "publishing or otherwise disclosing to any third party any video, audio, photographic, or other recordings taken, or any confidential information learned, at any [National Abortion Federation] annual meetings," by, among other

things, "uploading and disclosing [preliminary injunction] materials to CMP's YouTube channel."[2]

Additionally, this video violates California law because Dr. Taylor's consent to record her conversation was not obtained. Cal. Penal Code § 632(a) ("A person who, intentionally and without consent of all parties to a confidential communication, uses a . . . recording devise to eavesdrop upon or record the confidential communication . . . shall be punished by a fine not exceeding [$2,500] per violation, or imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."). In California, *any* evidence obtained as a result of such a surreptitious and illegal recording "is not admissible in any judicial, administrative, legislative, or other proceeding." Cal. Penal Code § 632(d).

## II.    ARGUMENT

### A.    Legal Standard

#### 1.    Rule 26

Discovery must be relevant and proportional. Fed. R. Civ. P. 26(b)(1); *R. Prasad Indus. v. Flat Irons Environmental Solutions Corp.*, No. CV–12–08261–PCT–JAT, 2014 WL 2804276, at *2 (D. Ariz. June 20, 2014) (stating Rule 26 informs Rule 45 "because it defines the permissible scope of discovery, and a Rule 45 subpoena is subject to that same scope" (citations omitted)). "Th[e] mere relevance' standard [of Rule 26], however, does not apply to nonparties." *R. Prasad*, 2014 WL 2804276, at *2 (citations omitted). "To obtain discovery from a nonparty, a party must demonstrate that its need for discovery outweighs the nonparty's interest in nondisclosure." *Id.* (citation omitted). Rule 26(b)(2)(C) also requires courts to limit discovery where, *inter alia*, the discovery sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

---

[2] CMS, and other parties, have filed a notice of appeal of this ruling. Dr. Taylor can provide copies of these sanction orders, if needed or requested.

6

Additionally, under Rule 26(c)(1), the court "may, for good cause, issue an order to protect a . . . person from annoyance, embarrassment, oppression, or undue burden or expense" by either "forbidding the . . . discovery" or "specifying terms . . . for the . . . discovery," including "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters."  Fed. R. Civ. P. 26(c)(1)(A), (B) & (D).

### 2.    Rule 45

Under Rule 45(d)(3)(A), "[o]n timely motion, the court for the district where compliance is required *must quash or modify* a subpoena that:

> (i) fails to allow a reasonable time to comply;
>
> . . .
>
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
> (iv) subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(3)(A) (emphasis added); *Am. Reliable Ins. Co. v. RoundPoint Mortgage Servicing Corp.*, No. MC-16-00082-PHX-SPL, 2016 WL 9108032, at *1 (D. Ariz. Nov. 15, 2016) ("Rule 45(d)(3)(A) requires a court to modify or quash a subpoena that imposes an undue burden."); *Games2U, Inc. v. Game Truck Licensing, LLC*, No. MC–13–00053–PHX–GMS, 2013 WL 4046655, at *1 (D. Ariz. Aug. 9, 2013) (same); *see also* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.").[3]

An evaluation of undue burden under Rule 45(c)(3)(A)(iv) requires a court to assess factors such as the scope of the information sought, the relevance of this

---

[3] This Court is "the district where compliance is required."  Fed. R. Civ. P. 45 advisory committee's note to 2013 amendment ("To protect local nonparties, local resolution of disputes about subpoenas is assured by the limitations of Rule 45(c) and the requirements in Rules 45(d) and (e) that motions be made in the court in which compliance is required under Rule 45(c).").

information, and the need for it. *See Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005); *see also id.* ("Although irrelevance is not among the litany of enumerated reasons for quashing a subpoena found in Rule 45, courts have incorporated relevance as a factor when determining motions to quash a subpoena." (citation omitted)). The court may also consider "whether (i) the subpoena was issued primarily for purposes of harassment, (ii) there are other viable means to obtain the same evidence, and (iii) to what extent the information sought is . . . crucial to the moving party's case." *Recycled Paper Greetings, Inc. v. Davis*, No. 1:08-MC-13, 2008 WL 440458, at *3 (N.D. Ohio Feb. 13, 2008) (citations and quotation marks omitted). "Courts are particularly reluctant to require a non-party to provide discovery that can be produced by a party." *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 409–10 (C.D. Cal. 2014).

### B. The Subpoena Should Be Quashed Because It Fails to Provide Dr. Taylor a Reasonable Time to Comply.

Respondent seeks to depose Movant on October 4. Counsel for Movant has offered two alternative dates – October 18 and October 25. Neither were acceptable to Respondent because "[their] scheduling order won't allow [them] to wait that long." *See* Exhibit 5. Respondent has stated that he *might* be able to move the deposition to the week of October 9 – a delay of about a week (or less). *Id.*

The State of Arizona has imposed a number of restrictions on the ability of women to receive abortion services. A woman must receive state-directed counseling that includes information designed to discourage her from having an abortion, then wait 24 hours before the procedure may occur. A.R.S. § 36-2153. This counseling must occur in person and must take place before the waiting period begins, thereby necessitating two trips to the doctor's office. *Id.* Additionally, a woman must undergo an ultrasound at least 24 hours before obtaining an abortion, which could require a *third* trop to her provider's office. A.R.S. § 36-2156. Health plans administered by the State,

8

such as those purchased under Arizona's Affordable Care Act exchange and those administered by Arizona Health Care Cost Containment System (AHCCCS), do not provide coverage for these visits. *See, e.g.* A.R.S. § 36-2907. Women must already make several visits to their doctor's office – often at their own expense – in order to obtain an abortion. These multiple visits can be difficult for women who must also juggle family and employment obligations, and who do not have the financial means to pay for these services themselves.

If the deposition goes forward as scheduled, Dr. Taylor will be forced to cancel appointments to see patients. These patients will have had to make arrangements with their employers and their families to be able to see Dr. Taylor, and are often paying for Dr. Taylor's services themselves. Forcing them to reschedule on such short notice will mean that they have to make arrangements for *yet another* visit to their doctor's office, in addition to those already mandated by state law. This will create significant – and unnecessary – hardship. Some women may be unable to reschedule because the window within which they may seek Dr. Taylor's services is so strictly limited by Arizona law. *See* A.R.S. § 36-2159. Dr. Taylor has an interest in seeing that the needs of her patients are appropriately met, and this Subpoena will severely burden that interest.

The propriety of the Subpoena aside, Respondent should have worked with Dr. Taylor to schedule a time for this deposition that will not unduly burden her, her practice, and her patients. The Subpoena should be quashed because it does not provide Dr. Taylor with a reasonable time within which to comply.

**C.      The Subpoena Should Be Quashed Because It Subjects Dr. Taylor to an Undue Burden.**

The Subpoena subjects Dr. Taylor to an undue burden that is disproportionate to Respondent's purported need for Dr. Taylor's testimony. Respondent is unlikely to learn anything from Dr. Taylor that he will be unable to learn from the actual parties to

9

the Texas Litigation, and so it makes little sense to subject Dr. Taylor and her patients to this unnecessary burden.

First, Dr. Taylor has no personal information directly relevant to the Texas Litigation. She has never practiced in Texas or subject to Texas law. She has never worked for any of the Plaintiffs in the Texas Litigation. And she has no personal knowledge of or connection to the Texas Litigation. These absences alone justify quashing the Subpoena. *See* Fed. R. Civ. P. 45 advisory committee's note to 1991 amendment ("Illustratively, it might be unduly burdensome to compel an adversary to attend trial as a witness if the adversary is known to have no personal knowledge of matters in dispute . . . .").

Second, as of this Motion, Respondent has failed to elucidate a coherent reason to take Dr. Taylor's deposition, let alone an actual need to do so. At best, Respondent's only substantive reason as to why he seeks to take Dr. Taylor's deposition is that she is a doctor who performs abortions generally and abortions, very broadly, are at issue in the Texas Litigation. Following this reasoning to its local extreme, Respondent could subpoena anyone in the country who has any knowledge whatsoever of abortions. This would be an absurd result. This Court has quashed subpoenas duces tecum for less, and it should do the same here. *See Am. Reliable*, 2016 WL 9108032, at *2 (quashing subpoena, in part, because subpoenaing party "does not state what information it seeks" and "fails to provide reasonable particularity").

Third, given the apparent basis for Dr. Taylor's deposition, Respondent could easily turn to a party to the Texas Litigation to obtain the same information. Indeed, four physicians are in fact Plaintiffs in the Texas Litigation.

Fourth, and lastly, a reasonable basis exists to infer that the Subpoena was issued primarily for purposes of harassment. While Mr. Hilton refused to acknowledge the video about Dr. Taylor discussed above in conversations with counsel for Dr. Taylor, he was plainly referencing the same as a ground to take Dr. Taylor's deposition. But

10

neither the video nor it contents are at issue in the Texas Litigation. The video is not even remotely relevant to the actual issues in the Texas Litigation. Evidently, Respondent is trying to make it so unpleasant and uncomfortable for healthcare providers to provide abortions that other healthcare providers will reconsider their work.

### D. The Subpoena Should Be Quashed Because It May Require the Disclosure of Privileged or Other Protected Information.

Because the Respondent has not and cannot define what he seeks or needs from Dr. Taylor, the scope of any potential deposition is unknown. But Dr. Taylor's work as a physician, particularly an obstetrician-gynecologist, involves potentially sensitive patient information. Arizona recognizes the physician-patient privilege. *See, e.g.*, A.R.S. §§ 12-2235 and 12-2292 (codifying a physician-patient privilege). Respondent should not be allowed to obtain this information.

### E. In the Alternative, the Court Should Issue a Protective Order.

Due to the vagaries surrounding the Subpoena, good cause exists for a protective order to limit any deposition of Dr. Taylor, if the Court does not quash the Subpoena. Based on the circumstances of the Texas Litigation, any deposition of Dr. Taylor should be limited to (i) the mechanics of the D&E procedure only and (ii) a one-hour time limit, since this information is surely available from a party in the Texas Litigation.

## III. CONCLUSION

Respondent is unable to articulate why he needs to depose Dr. Taylor. Indeed, he even seems unfamiliar with the alleged statements made by Dr. Taylor that he thinks should subject her to a time-consuming and invasive deposition. Perhaps Mr. Hilton should have "googled" Dr. Taylor before noticing her deposition.

Because the deposition of Dr. Taylor could have no possible relevance to the Texas Litigation, would subject Dr. Taylor and her patients to an undue burden, and could force her to reveal sensitive patient information, the Court should quash the

11

Subpoena.   In the alternative, the Court should issue a protective order that strictly limits any deposition of Dr. Taylor to (i) the mechanics of the D&E procedure only and (ii) a one-hour time limit.

DATED this 28th day of September, 2017.

OSBORN MALEDON, P.A.

By      s/*Randy McDonald*
Randy McDonald
Colin M. Proksel
2929 North Central Avenue
21st Floor
Phoenix, Arizona  85012-2793
Attorneys for Dr. DeShawn Taylor

CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September, 2017 the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System and that I served the attached document by Electronic Mail on the following, who are not registered participants of the CM/ECF System:

Adam A. Biggs
Christopher D. Hilton
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
Phone: (512) 475-4120
Fax: (512) 320-0667
Christopher.Hilton@oag.texas.gov
Adam.biggs@oag.texas.gov

/s/ Rosalin Sanhadja

12

# EXHIBIT 1

Randy McDonald, 032008
Colin M. Proksel, (*Pro hac vice* application forthcoming)
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona  85012-2793
(602) 640-9000
rmcdonald@omlaw.com
cproksel@omlaw.com

Attorneys for Dr. DeShawn Taylor

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DR. DESHAWN L. TAYLOR, ) | No. |
| ) | |
| Movant, ) | |
| ) | **MOVANT'S CERTIFICATE OF** |
| vs. ) | **GOOD FAITH CONSULTATION** |
| ) | |
| KEN PAXTON, ATTORNEY GENERAL ) | |
| OF TEXAS, ) | |
| ) | |
| Respondent. ) | |

Pursuant to Local Rule 7.2(j), the parties conferred by telephone and email before Movant filed her Emergency Motion to Quash Deposition Subpoena or in the Alternative for a Protective Order, but they were unable to resolve the issues. Accordingly, the parties concluded that the motion cannot be avoided.

DATED this 28th day of September, 2017.

OSBORN MALEDON, P.A.

By    /s/Randy McDonald
      Randy McDonald
      Colin M. Proksel
      2929 North Central Avenue
      21st Floor
      Phoenix, Arizona  85012-2793
      Attorneys for Dr. DeShawn Taylor

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

WHOLE WOMAN'S HEALTH; PLANNED              )
PARENTHOOD CENTER FOR CHOICE;              )
PLANNED PARENTHOOD OF GREATER TEXAS        )
SURGICAL HEALTH SERVICES; PLANNED          )
PARENTHOOD SOUTH TEXAS SURGICAL            )
CENTER; ALAMO CITY SURGERY CENTER          )
PLLC d/b/a ALAMO WOMEN'S REPRODUCTIVE      )
SERVICES; SOUTHWESTERN WOMEN'S             )
SURGERY CENTER; and NOVA HEALTH            )
SYSTEMS, INC. d/b/a REPRODUCTIVE           )        CAUSE NO. A-17-CV-690-LY
SERVICES, each on behalf of itself, its staff,   )
physicians and patients; and CURTIS BOYD, M.D.;  )
ROBIN WALLACE, M.D.; BHAVIK KUMAR,         )
M.D.; and ALAN BRAID, M.D., each on behalf of    )
himself and his patients,                   )
                                            )
                        Plaintiffs,         )
                                            )
v.                                          )
                                            )
KEN PAXTON, Attorney General of Texas;     )
MARGARET MOORE, District Attorney for Travis )
County; NICHOLAS LAHOOD, Criminal District )
Attorney for Bexar County; JAIME ESPARZA,  )
District Attorney for El Paso County; FAITH )
JOHNSON, District Attorney for Dallas County; )
SHAREN WILSON, Criminal District Attorney for )
Tarrant County; RICARDO RODRIGUEZ, JR.,    )
Criminal District Attorney for Hidalgo County; )
ABELINO REYNA, Criminal District Attorney for )
McLennan County; and KIM OGG, Criminal District )
Attorney for Harris County, each in their official )
capacities, as well as their employees, agents, and )
successors,                                 )
                                            )
                        Defendants.         )

**FIRST AMENDED COMPLAINT**

Plaintiffs, by and through their undersigned attorneys, bring this Complaint against the above-named Defendants, their employees, agents and successors in office, and in support thereof allege the following:

## I. PRELIMINARY STATEMENT

1. Pursuant to 42 U.S.C. § 1983, Plaintiffs, Texas healthcare providers, bring this action on behalf of themselves, their staff, physicians, and patients. They challenge certain provisions of Texas Senate Bill 8, enacted during the 2017 legislative session ("S.B. 8"), that ban the dilation and evacuation abortion procedure ("D & E"), the safest and most common method of abortion after approximately 15 weeks of pregnancy. S. B. 8, creating Tex. Health & Safety Code §§ 171.151-154. A copy of S.B. 8 is attached hereto as Exhibit 1. These provisions are scheduled to take effect on September 1, 2017.

2. The ban on D & E threatens the health of Plaintiffs' patients and their access to abortion care, subjects Plaintiffs to criminal penalties, and violates Plaintiffs' patients' constitutional rights. Specifically, a ban on D & E procedures imposes an undue burden on women seeking second-trimester abortions. In addition, to the extent that any physician can continue to provide D & E procedures, the ban violates Plaintiffs' patients' right to bodily integrity because it would require them to accept unnecessary, invasive, and potentially painful medical procedures, in order to access their constitutional right to abortion.

3. To protect Plaintiffs and their patients from these constitutional violations, and to avoid irreparable harm, Plaintiffs seek declaratory and injunctive relief to prevent enforcement of the D & E ban.

## II.  JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3).

5.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this court.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants Ken Paxton and Margaret Moore, who are sued in their official capacities, carry out their official duties in this district.

## III.  PLAINTIFFS

7.     Plaintiff Whole Woman's Health operates licensed abortion facilities in Austin, Fort Worth, McAllen, and San Antonio.  Whole Woman's Health provides a range of reproductive health services, including medication and surgical abortions.  Whole Woman's Health provides abortions in the second trimester of pregnancy, including D & E procedures that would be banned should S.B. 8 take effect.  Whole Woman's Health sues on behalf of itself, its staff, physicians, and patients.

8.     Plaintiff Planned Parenthood Center for Choice ("PP Houston") operates a licensed ambulatory surgical center in Houston.  PP Houston provides a range of reproductive health services, including medication and surgical abortions.  PP Houston provides abortions in the second trimester of pregnancy, including D & E procedures that would be banned should S.B. 8 take effect.  PP Houston sues on behalf of itself, its staff, physicians, and patients.

9.      Plaintiff Planned Parenthood of Greater Texas Surgical Health Services ("PPGT Surgical Health Services") operates licensed ambulatory surgical centers in Austin, Dallas, and Fort Worth, and a licensed abortion facility in Waco. PPGT Surgical Health Services provides a range of reproductive health services, including medication and surgical abortions. PPGT Surgical Health Services provides abortions in the second trimester of pregnancy, including D & E procedures that would be banned should S.B. 8 take effect. PPGT Surgical Health Services sues on behalf of itself, its staff, physicians, and patients.

10.      Plaintiff Planned Parenthood South Texas Surgical Center ("PPST Surgical Center") operates a licensed ambulatory surgical center in San Antonio. PPST Surgical Center provides a range of reproductive health services, including medication and surgical abortions. PPST Surgical Center provides abortions in the second trimester of pregnancy, including D & E procedures that would be banned should S.B. 8 take effect. PPST Surgical Center sues on behalf of itself, its staff, physicians, and patients.

11.      Plaintiff Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services ("Alamo Women's"), is a licensed ambulatory surgical center in San Antonio. Alamo Women's provides a range of reproductive health services, including medication and surgical abortions. Alamo Women's provides abortions in the second trimester, including D & E procedures that would be banned should S.B. 8 take effect. Alamo Women's sues on behalf of itself, its staff, physicians, and patients.

12.      Plaintiff Southwestern Women's Surgery Center ("Southwestern") operates a licensed ambulatory surgical center in Dallas. Southwestern provides a range of reproductive health services, including medication and surgical abortions. Southwestern provides abortions in

4

the second trimester, including D & E procedures that would be banned should S.B. 8 take effect. Southwestern sues on behalf of itself, its staff, physicians, and patients.

13.     Plaintiff Nova Health Systems, Inc. d/b/a Reproductive Services ("Reproductive Services"), operates a licensed abortion facility in El Paso. Reproductive Services provides a range of reproductive health services, including medication and surgical abortion. Reproductive Services provides abortions in the second trimester, including D & E procedures that would be banned should S.B. take effect. Reproductive Services sues on behalf of itself, its staff, physicians, and patients.

14.     Curtis Boyd, M.D., is a family practice physician licensed to practice in the State of Texas. Dr. Boyd has an ownership interest in Southwestern. He provides D & E procedures that would be banned should S.B. 8 take effect. Dr. Boyd sues on his own behalf and on behalf of his patients.

15.     Robin Wallace, M.D., M.A.S., is a board-certified family medicine physician licensed to practice in the State of Texas. Dr. Wallace is the medical director at Southwestern. She provides D & E procedures that would be banned should S.B. 8 take effect. Dr. Wallace sues on her own behalf and on behalf of her patients.

16.     Bhavik Kumar, M.D., M.P.H., is a board-certified family medicine physician licensed to practice in the State of Texas. Dr. Kumar is the medical director for the Whole Woman's Health clinics in Texas. He provides D & E procedures that would be banned should S.B. 8 take effect. Dr. Kumar sues on his own behalf and on behalf of his patients.

17.     Alan Braid, M.D. is a board-certified obstetrician/gynecologist licensed to practice in the State of Texas. Dr. Braid has an ownership interest in Alamo Women's. He provides D & E

5

procedures that would be banned should S.B. 8 take effect.  Dr. Braid sues on his own behalf and on behalf of his patients.

## IV.  DEFENDANTS

18.     Defendant Ken Paxton is the Attorney General of Texas.  He is empowered to assist county and district attorneys in the prosecution of criminal offenses, Tex. Govt. Code § 574.004, and therefore criminal violations of S.B. 8.  He is sued in his official capacity and may be served with process at 300 West 15th Street, Austin, Texas 78701.

19.     Defendant Margaret Moore is the District Attorney for Travis County.  She is responsible for prosecuting criminal violations of the D & E ban occurring in Travis County.  She is sued in her official capacity and may be served with process at 509 West 11th Street, Room 300, Austin, Texas 78701.

20.     Defendant Nicholas LaHood is the Criminal District Attorney for Bexar County.  He is responsible for prosecuting criminal violations of the D & E ban occurring in Bexar County.  He is sued in his official capacity and may be served with process at 101 West Nueva Street, 4th Floor, San Antonio, Texas 78205.

21.     Defendant Faith Johnson is the District Attorney for Dallas County.  She is responsible for prosecuting criminal violations of the D & E ban occurring in Dallas County.  She is sued in her official capacity and may be served with process at 133 North Riverfront Boulevard, LB 19, Dallas, Texas 75207.

22.     Defendant Jaime Esparza is the District Attorney for El Paso County.  He is responsible for prosecuting criminal violations of the D & E ban occurring in El Paso County.  He is sued in his official capacity and may be served with process at El Paso County Courthouse, 500 East San Antonio Avenue, Room 201, El Paso, Texas 79901.

23.     Defendant Kim Ogg is the Criminal District Attorney for Harris County.  She is responsible for prosecuting criminal violations of the D & E ban occurring in Harris County.  She is sued in her official capacity and may be served with process at 1201 Franklin Street, Suite 600, Houston, Texas 77002.

24.      Defendant Ricardo Rodriguez, Jr., is the Criminal District Attorney for Hidalgo County.  He is responsible for prosecuting criminal violations of the D & E ban occurring in Hidalgo County.  He is sued in his official capacity and may be served with process at 100 East Cano, Edinburg, Texas 78539.

25.     Defendant Abelino Reyna is the Criminal District Attorney for McLennan County.  He is responsible for prosecuting criminal violations of the D & E ban occurring in McLennan County.  He is sued in his official capacity and may be served with process at 219 North 6th Street, Suite 200, Waco, Texas 76701.

26.     Defendant Sharen Wilson is the Criminal District Attorney for Tarrant County.  She is responsible for prosecuting criminal violations of the D & E ban occurring in Tarrant County.  She is sued in her official capacity and may be served with process at the Tim Curry Criminal Justice Center, 401 West Belknap Street, Fort Worth, Texas 76196-0201.

## V.  FACTUAL ALLEGATIONS

**Background**

27.     Legal abortion is extremely safe, and safer for a woman than carrying a pregnancy to term and giving birth.

28.     Nonetheless, the earlier in pregnancy a woman is able to accesses abortion care, the safer it is for her because remaining pregnant itself entails risks and the risks associated with abortion increase as pregnancy advances.

29.     In Texas, as in the nation as a whole, the vast majority of women who seek abortion care do so in the first trimester of pregnancy.  Likewise, the great majority of second-trimester abortions occur in the early weeks of the second trimester.  Still, a significant number of women in Texas seek abortions between 14 and 22 weeks, as measured from the first day of the woman's last menstrual period ("LMP").

30.     Women seek abortion during the second trimester for the same reasons they seek earlier procedures, including a variety of personal and medical reasons.  Women may also seek abortion during the second trimester because they have been delayed due to late confirmation of pregnancy or difficulty gathering funds to pay for the procedure or organizing the logistics of necessary travel, time off work and child care.  In addition, the identification of major anatomic or genetic anomalies in the fetus most commonly occurs in the second trimester, and women may choose to terminate a pregnancy for that reason.

31.     Women face many obstacles accessing abortion care in Texas.

32.     Many abortion patients are low income, and struggle to make arrangements for, and absorb the cost of, missed work, childcare if they have children, which most do, transportation to and from the clinic, and any needed hotel rooms.  These burdens are increased by Texas's mandate that a woman make an additional, unnecessary trip to a physician, to receive state-mandated counseling and an ultrasound in person, and then delay at least 24 hours before making another trip to obtain her abortion.

33.     As a result of existing Texas regulations, an abortion of a fetus age 16 weeks gestational age or more may be performed only at an ambulatory surgical center or hospital licensed to perform the abortion.  Tex. Health & Safety Code § 171.004.  In addition, abortions

8

are prohibited after 20 weeks post-fertilization, except in narrow circumstances. Tex. Health & Safety Code § 171.044.

34. S.B. 8 is the latest in a long string of attempts by Texas to place burdensome, medically unnecessary restrictions on women's access to abortion. In 2003, Texas instituted a 24-hour mandatory delay between a woman providing informed consent for an abortion and her obtaining the procedure. In 2011, Texas amended its informed consent requirements regarding abortion to include a mandatory ultrasound at least 24 hours before the procedure (or two hours for patients who live at leave 100 miles from the nearest licensed abortion facility). In June of 2016, the United States Supreme Court struck down two provisions of another Texas anti-abortion law, because the burdens imposed by the restrictions outweighed any benefits the requirements advanced. *Whole Woman's Health v. Hellerstedt*, __ U.S. ___, 136 S. Ct. 2292 (2016). Just four days after the Supreme Court issued its decision, the Texas Department of State Health Services published proposed regulations eliminating the typical, medically appropriate methods of disposal for embryonic and fetal tissue, and instead requiring healthcare facilities to dispose of all such tissue from abortion and miscarriage by burial or cremation. This court granted a preliminary injunction blocking the amendments from taking effect, noting that the circumstances suggested that "the actual purpose of the Amendments is to limit abortion access in Texas." *Whole Woman's Health v. Hellerstedt*, No. 1:16-cv-01300-SS, __ F. Supp. 3d ___, 2017 WL 462400 (W.D. Tex. Jan. 27, 2017), *appeal docketed*, No. 17-50154 (5th Cir. Mar. 1, 2017).

35. The Texas legislature introduced more than fifty restrictive abortion bills during the 2017 regular session. S.B. 8 as originally drafted and debated was an unrelated abortion restriction. The D & E ban and other restrictions were attached as last minute amendments, without committee hearings and with scant debate.

9

**The Ban on D & E Procedures**

36.      The challenged provisions of S.B. 8 criminalize the performance of what the statute calls a "dismemberment abortion."  Although this is not a medical term that is used by physicians or that appears in any medical literature, the definition in the statute clearly prohibits a procedure referred to in the medical profession as dilation and evacuation or "D & E."  D & E, which can be performed in an outpatient setting, is the safest and most common method of abortion after approximately 15 weeks of pregnancy.

37.      S.B. 8 defines "dismemberment abortion" as follows:

"[D]ismemberment abortion" means an abortion in which a person, with the purpose of causing the death of an unborn child, dismembers the living unborn child and extracts the unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or a similar instrument that, through the convergence of two rigid levers, slices, crushes, or grasps, or performs any combination of those actions on, a piece of the unborn child's body to cut or rip the piece from the body.  The term does not include an abortion that uses suction to dismember the body of an unborn child by sucking pieces of the unborn child into a collection container.  The term includes a dismemberment abortion that is used to cause the death of an unborn child and in which suction is subsequently used to extract pieces of the unborn child after the unborn child's death.

S.B. 8, creating Tex. Health & Safety Code § 171.151.

38.      The only exception to S.B. 8's prohibition on D & E procedures is for instances in which a "medical emergency" exists.  Although not further defined within the subchapter creating the D & E ban, "medical emergency" is defined elsewhere in the same chapter of the Texas Health and Safety Code to mean:  "a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed."  Tex. Health & Safety Code § 171.002(3).

39.     Violation of the ban is a "state jail felony," S.B. 8, creating § 171.153, punishable by a minimum of 180 days to a maximum of two years in jail, and a fine of up to $10,000. Tex. Penal Code § 12.35(a)-(b).

40.     S.B. 8 also separately bans a distinct variant of the D & E procedure, known by the medical term dilation and extraction ("D & X"), a procedure previously used by a minority of physicians later in the second trimester. S.B. 8, creating §§ 171.101-106. This prohibition, which purports to ban so-called "partial-birth" abortions, is substantially similar to a federal prohibition that is currently in effect, 18 U.S.C. § 1531, and is not challenged here.

**The Impact of the D & E Ban on Women Seeking Second-Trimester Abortions**

41.     S.B. 8 bans dilation and evacuation abortion, or D & E, the safest and most common abortion method used after approximately 15 weeks of pregnancy. Enforcement of the ban would threaten women's bodily autonomy, health, and access to abortion in Texas.

42.     In the first trimester of pregnancy, abortions are performed using medical or instrumental (also called surgical) means. Medication abortions, which are typically available up to 10.0 weeks LMP, involve the ingestion of two medications to terminate the pregnancy, in a process similar to a miscarriage. Instrumental abortions in the first trimester are performed using a suction device to aspirate (or empty) the uterus.

43.     For all instrumental abortions, before the physician can remove the products of conception, it is necessary to dilate the cervix to allow the passage of instruments. Adequate cervical preparation is critical to ensuring the procedure is performed safely and without trauma to the cervix. Dilation can be accomplished by a variety of means, depending on the patient and the length of the pregnancy. Methods include the use of mechanical dilators, ingestion of

11

medications, and, after the first trimester, can include the insertion of osmotic dilators into the cervix, which absorb moisture and gradually expand.

44.     Starting at approximately 14.0 weeks LMP, physicians may use a combination of suction and forceps or other instruments to remove the fetus and other products of conception from the uterus.  Because the cervical opening is smaller than the fetus, separation or disarticulation of fetal tissue usually occurs as the physician uses instruments to bring the tissue through the cervix. A procedure in which the physician uses instruments, alone or in conjunction with suction, to empty the uterus in this manner is known as D & E.

45.     D & E is safely performed as an outpatient procedure throughout the second trimester of pregnancy.  The evacuation phase takes approximately 10 minutes.

46.     Other than D & E, the only other medically-proven abortion method available throughout the second trimester is induction abortion, where a physician uses medication to induce labor and delivery of a non-viable fetus.  Induction of labor accounts for only about 5% of second-trimester abortions nationally.  Induction abortions must be performed in a hospital or similar facility that has the capacity to monitor a patient overnight.  Induction abortions can last anywhere from five hours to three days; are extremely expensive; entail more pain, discomfort, and recovery time for the patient—similar to that of a woman giving birth—than D & E; and are medically contraindicated for some patients.

47.     Many Texas hospitals prohibit abortions except in very limited circumstances and therefore the option of second-trimester induction, in addition to the added time, expense, and physical and emotional burdens, is not available to most women in Texas.

12

48.     The D & E ban does not apply in instances in which the physician—through a separate procedure—causes fetal demise prior to starting the evacuation phase of the D & E.  This does not, however, materially narrow the scope of the ban or lessen its impact.

49.     Before 18 weeks LMP, there is no reliable, safe, studied, or medically appropriate way for Plaintiffs to attempt to cause fetal demise.  Attempting to do so would be difficult and would impose risks with no medical benefit to the patient, and is virtually untested, has unknown risks and uncertain efficacy.  Requiring demise in every instance would be outside the standard of care and would in some circumstances amount to experimental procedures.

50.     Starting at 18 or 20 weeks LMP, some, but not all, physicians in Texas use a hypodermic needle to inject a drug called digoxin transabdominally (through the abdomen into the uterus) or transvaginally (through the vaginal wall or through the cervix) to attempt to cause fetal demise.

51.     Because digoxin can take up to 24 hours to cause fetal demise, even if such injections were feasible and medically appropriate prior to 18 weeks LMP—which they are not— its use in the early second trimester would require women to make an additional and unnecessary trip to the clinic because, but for the need for demise, the physician could achieve adequate dilation and complete the procedure in one visit.  This extra trip would be a tremendous burden on patients, compounding the burdens patients already face, and introducing untested and unnecessary health risks.

52.     The physicians who use digoxin to attempt to induce fetal demise do so for a variety of reasons, including out of fear of prosecution under the federal ban on so-called partial-birth abortions, now also prohibited by S.B. 8, creating Texas Health and Safety Code §§ 171.101-106. While some physicians feel that demise makes the procedure easier because the fetal tissue may

13

soften as a result of demise, published data show that use of digoxin provides no clear medical benefit to the patient. According to the American Congress of Obstetricians and Gynecologists: "No evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion." Am. Coll. Obstetricians & Gynecologists, *Practice Bulletin Number 135: Second-Trimester Abortion* (June 2013).

53. Risks associated with digoxin injections include infection, delivery of the fetus outside of a healthcare facility, and an increased risk of hospitalization. The procedure, which involves injection using a long needle, can also be painful and cause severe anxiety for many women. In addition, the procedure is more difficult for some women due to anatomical characteristics, such as obesity, fibroids, and cesarean scars from previous deliveries, and more risky for women with certain heart conditions should the digoxin enter the maternal circulation.

54. Digoxin also sometimes fails to cause fetal demise in the expected period of time after the injection. If the D & E ban were to go into effect, a second injection would be necessary in this situation, but this is unstudied and is not accepted medical practice for the vast majority of patients, who are already adequately dilated and otherwise ready to proceed with the procedure. A second injection would add yet another day to the procedure, increase the risk of infection and extramural delivery, particularly for patients already well dilated, as well as increase the burdens on women seeking second-trimester abortions, with no medical justification. Physicians who currently use digoxin rarely, if ever, administer second injections of digoxin.

55. It is not clear whether the medical emergency exception provides physicians with protection from criminal prosecution if faced with the scenario in which digoxin has failed to cause demise within the expected time, but it is in the patient's best medical interest to complete the procedure, because it is unlikely that a physician could certify, on pain of criminal penalty, that

14

the condition, although serious, comes within the extremely narrow definition of medical emergency. Tex. Health & Safety Code § 171.002(3).

56. There are no other reliable, safe, and available methods of attempting to cause fetal demise in the outpatient setting. An injection of KCl (potassium chloride) directly into the fetal heart does effectively cause demise, but requires years of specialized training and hospital-grade equipment, and can be fatal to the woman if administered incorrectly.

57. Moreover, current Texas law prohibits the off-label prescription of an "abortion-inducing drug." Tex. Health & Safety Code § 171.063. This law applies to the provision of abortions using medications, rather than abortions using instruments. However, on its face, the law could also apply to the use of any substance, including digoxin or KCl, to cause fetal demise prior to abortion because neither of these drugs are labeled for that purpose. Out of an abundance of caution, some Texas physicians do not use digoxin to cause fetal demise for fear of prosecution under this provision.

58. Nor is umbilical cord transection, where a clinician attempts to grasp and divide the umbilical cord to cause demise, a realistic means of avoiding criminal prosecution under the D & E ban. Umbilical cord transection can be very difficult, especially at earlier gestational ages, and it may not be possible for every patient. A physician cannot know ahead of time if he or she will be able to safely grasp the cord, but at that point the procedure is underway and it exposes the woman to increased risks, such as risk of infection, not to complete the procedure. Umbilical cord transection also exposes patients to increased risk of uterine perforation, cervical injury, and bleeding; and would prolong the D & E, also increasing risks. Additionally, there is a risk that a physician attempting to grasp the cord will instead grasp fetal tissue, and therefore violate, rather than circumvent, the D & E ban.

15

Case 1:17-cv-00690-LY Document 47 Filed 08/18/17 Page 16 of 20

59.     The safest and most efficacious way for a physician to perform a D & E procedure or to attempt to induce fetal demise if the physician believes there are reasons to do so, is by using the techniques with which the physician is familiar and comfortable, based on his or her training and experience.

60.     Before starting a D & E, it is impossible to know whether an attempt to cause fetal demise will be possible or successful.  Thus, the effect of S.B. 8 is that Plaintiffs may be prevented from starting any D & E because they know they may not be able to complete the procedure without violating the D & E ban.

61.     S.B. 8 therefore imposes a criminal ban, and significant penalties, on the performance of D & E, the safest and most common method of second-trimester abortion after approximately 15 weeks of pregnancy, leaving physicians with no reasonable alternatives by which to continue providing this abortion care.

62.     Enforcement of the D & E ban would irreparably harm women seeking second-trimester abortions by denying them access to the safest and most common method of abortion after approximately 15 weeks of pregnancy.  Even if limited access remains available, the ban forces women seeking second-trimester abortions to undergo more complex and risky procedures, including compelling them to undergo painful, untested, and invasive medical procedures, in order to access their constitutional right to abortion.

63.     Enforcement of the D & E ban would also subject Plaintiffs' patients to irreparable harm from the violation of their constitutional rights.

## CLAIMS FOR RELIEF

### COUNT I

**(Due Process—Undue Burden on Plaintiffs' Patients' Right to Liberty and Privacy)**

64.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 63.

65.     By banning the safest and most common method of abortion used after approximately 15 weeks of pregnancy, the D & E ban violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it imposes an undue burden on women seeking to terminate a pregnancy before viability.

### COUNT II

**(Due Process—Plaintiff's Patients' Right to Bodily Integrity)**

66.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 65.

67.     By forcing women to undergo additional, invasive, and potentially painful procedures to obtain a second-trimester abortion or continue a pregnancy, the D & E ban violates Plaintiffs' patients' right to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### INJUNCTIVE RELIEF

68.     The D & E ban subjects Plaintiffs' patients to irreparable harm for which there exists no adequate remedy at law, and threatens Plaintiffs with substantial penalties for providing constitutionally protected abortion care.

17

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A. To issue a preliminary injunction and permanent injunction restraining Defendants and their successors in office from enforcing the D & E ban, and specifically those provisions of S.B. 8 creating Texas Health and Safety Code §§ 171.151-154.

B. To enter a judgment declaring that the D & E ban, and specifically those provisions of S.B. 8 creating Texas Health and Safety Code §§ 171.151-154, violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

C. To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D. To grant such other and further relief as the Court deems just and proper.


Dated: August 18, 2017


Respectfully submitted,


  /s/ Patrick J. O'Connell
Patrick J. O'Connell
Texas Bar No. 15179900
Law Offices of Patrick J. O'Connell PLLC
2525 Wallingwood, Bldg. 14
Austin, Texas 78746
(512) 852-5918
pat@pjofca.com

*Attorney for all Plaintiffs*

18

Janet Crepps*
Molly Duane*
Center for Reproductive Rights
199 Water St. 22nd Floor
New York, NY 10038
(864) 962-8519 (Janet Crepps)
(917) 637-3631 (Molly Duane)
jcrepps@reprorights.org
mduane@reprorights.org

J. Alexander Lawrence*
Morrison & Foerster LLP
250 W. 55th Street
New York, NY 10019
(212) 336-8638
alawrence@mofo.com

*Attorneys for Plaintiffs Whole Woman's Health,
Alamo City Surgery Center, Southwestern Women's
Surgery Center, Nova Health Systems, Curtis Boyd,
M.D., Robin Wallace, M.D., Bhavik Kumar, M.D., and
Alan Braid, M.D.*

Melissa Cohen*
Planned Parenthood Federation of America
123 William Street
New York, NY 10038
(212) 261-4649
melissa.cohen@ppfa.org

*Attorney for Plaintiffs Planned Parenthood Center
For Choice, Planned Parenthood of Greater Texas
Surgical Health Services, and Planned Parenthood
South Texas Surgical Center*

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of August 2017, I electronically filed a copy of the

above document with the Clerk of the Court using the CM/ECF system.


        */s/ Patrick J. O'Connell*_____

Patrick J. O'Connell

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

17 AUG 31  PM 4: 12

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ AD

| | |
|---|---|
| WHOLE WOMAN'S HEALTH, PLANNED PARENTHOOD CENTER FOR CHOICE, PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES, PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER, ALAMO CITY SURGERY CENTER PLLC, D/B/A ALAMO WOMEN'S REPRODUCTIVE SERVICES, SOUTHWESTERN WOMEN'S SURGERY CENTER, NOVA HEALTH SYSTEMS, INC. D/B/A REPRODUCTIVE SERVICES, EACH ON BEHALF OF ITSELF, ITS STAFF, PHYSICIANS, AND PATIENTS, CURTIS BOYD, M.D., ROBIN WALLACE, M.D., BHAVIK KUMAR, M.D., M.P.H., ALAN BRAID, M.D., EACH ON THEIR OWN BEHALF AND ON THEIR PATIENTS' BEHALF, PLAINTIFFS, | § § § § § § § § § § § § § § § § § § § § § § |
| V. | § § |
| KEN PAXTON, ATTORNEY GENERAL OF TEXAS, IN HIS OFFICIAL CAPACITY, AND MARGARET MOORE, DISTRICT ATTORNEY FOR TRAVIS COUNTY, NICHOLAS LAHOOD, CRIMINAL DISTRICT ATTORNEY FOR BEXAR COUNTY, JAIME ESPARZA, DISTRICT ATTORNEY FOR EL PASO COUNTY, FAITH JOHNSON, DISTRICT ATTORNEY FOR DALLAS COUNTY, SHAREN WILSON, CRIMINAL DISTRICT ATTORNEY TARRANT COUNTY, RICARDO RODRIGUEZ, JR., CRIMINAL DISTRICT ATTORNEY FOR HIDALGO COUNTY, ABELINO REYNA, CRIMINAL DISTRICT | § § § § § § § § § § § § § § § § § § |

CAUSE NO. A-17-CV-690-LY

| ATTORNEY FOR MCLENNAN | § |
| COUNTY, AND KIM OGG, CRIMINAL | § |
| DISTRICT ATTORNEY FOR HARRIS | § |
| COUNTY, EACH IN THEIR OFFICIAL | § |
| CAPACITY, | § |
| DEFENDANTS. | § |
| | § |

## TEMPORARY RESTRAINING ORDER

Before the court is the above styled and numbered cause challenging the constitutionality of recently enacted Texas abortion laws. *See* 42 U.S.C. § 1983. The laws at issue are included in Texas Senate Bill 8, Section 6, which, *inter alia*, creates a new Subchapter G in the Texas Health and Safety Code. *See* Act of May 26, 2017, 85th Leg., R.S., ch. 441, § 6, 2017 Tex. Sess. Law Serv. _____ (West) (to be codified at Tex. Health & Safety Code Ch. 171, Subchapter G, §§ 171.151-.154) (the "act"). The act goes into effect September 1, 2017. *Id.* at ch. 441, § 22.

Plaintiffs Whole Woman's Health, Planned Parenthood Center for Choice, Planned Parenthood of Greater Texas Surgical Health Services, Planned Parenthood South Texas Surgical Center, Alamo City Surgery Center PLLC, Southwestern Women's Surgery Center, Nova Health Systems, Inc., Curtis Boyd, M.D., Robin Wallace, M.D., Bhavik Kumar, M.D., M.P.H., and Alan Braid, M.D. (collectively "Plaintiffs"), all providers of abortion services, bring this action on behalf of themselves their staff, physicians, and patients against Defendants Ken Paxton, Attorney General of Texas, in his official capacity, and Travis County District Attorney Margaret Moore, Bexar County Criminal District Attorney Nicholas LaHood, El Paso District Attorney Jaime Esparza, Dallas County District Attorney Faith Johnson, Tarrant County Criminal District Attorney Sharen Wilson, Hidalgo

2

County Criminal District Attorney Ricardo Rodriguez, Jr., McLennan County Criminal District Attorney Abelino Reyna, and Harris County Criminal District Attorney Kim Ogg.[1]

Plaintiffs seek preliminary and permanent declaratory and injunctive relief holding that the act bans and criminalizes the performance of an abortion procedure commonly known as a dilation and evacuation procedure ("standard D&E") before fetal demise, and is, therefore, unconstitutional because the act has the effect of placing a substantial obstacle in the path of a woman who seeks an abortion before the fetus attains viability.[2] *See Whole Woman's Health v. Hellerstedt*, ___ U.S. ___; 136 S.Ct. 2292, 2300 (2016) (citing *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 878 (1992)).

Pending is Plaintiffs' Motion For a Preliminary Injunction or, In the Alternative, a Temporary Restraining Order, and Memorandum of Law in Support filed July 20, 2017 (Clerk's Document No.

---

[1] Plaintiffs and five of the eight local-prosecutor defendants, including Defendants Travis County District Attorney Margaret Moore, Bexar County Criminal District Attorney Nicholas LaHood, El Paso District Attorney Jaime Esparza, Hidalgo County Criminal District Attorney Ricardo Rodriguez, Jr., and Harris County Criminal District Attorney Kim Ogg ("Nonparticipating Defendants") stipulate to the following: (1) the Nonparticipating Defendants will not (a) enforce the challenged portions of the act until a final non-appealable decision has been rendered in this action; (b) participate in litigating this action unless required to do so thereby conserving prosecutorial resources; and (c) will not file answers, unless ordered by the court; and (2) Plaintiffs (a) shall take no default judgment against the Nonparticipating Defendants; and (b) will not seek attorney's fees, penalties, damages, or any costs or expense of any kind from the Nonparticipating Defendants.

Defendants District Attorney for Dallas County, Faith Johnson; Criminal District Attorney for Tarrant County, Sharen Wilson; and Criminal District Attorney for McLennan County, Abelino Reyna are actively participating in this action. As the interests of these three local-prosecutor defendants are aligned with Paxton, the court refers to them collectively as "the State."

[2] The court refers to the abortion procedure at issue as a "standard D&E" procedure so as to distinguish it from an "intact D&E," also known as a "D&X" procedure, which involves dilating the cervix enough to remove the fetus intact. The intact D&E or D&X procedure is banned under the Federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure. *See* 18 U.S.C. § 1531; *Gonzales v. Carhart*, 550 U.S. 124, 127 (2007) (upholding federal partial-birth abortion ban).

6), the State's Response to Plaintiffs' Motion for a Temporary Restraining Order filed August 11, 2017 (Clerk's Document No. 41), and Plaintiffs' Reply in Support of a Temporary Restraining Order filed August 18, 2017 (Clerk's Document No. 49). Although the State's response to Plaintiffs' motion acknowledges that "[t]his is a significant case that deserves a full and fair adjudication with all relevant facts in the record, not rushed consideration," the State does not agree to maintain the *status quo* pending resolution of the issues in this case.

On August 29, 2017, the court held a hearing on Plaintiffs' request for a temporary restraining order at which all parties were represented by counsel. Having considered the Plaintiffs' motion, the State's response, the Plaintiffs' reply, the arguments of counsel, and the applicable law, the court finds and concludes that Plaintiffs satisfy the requirements for a temporary restraining order to maintain the *status quo* pending a hearing on Plaintiffs' request for a preliminary injunction. *See* Fed. R. Civ. P. 65.

**Legal standard for temporary restraining order**

The party moving for a temporary restraining order, like an applicant for a preliminary injunction, must establish four elements:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the temporary restraining order is denied; (3) that the threatened injury outweighs any damage that the temporary restraining order might cause the defendant; and (4) that the temporary restraining order will not disserve the public interest.

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)); *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A temporary restraining order is an extraordinary remedy which

4

should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements. *See PCI Transp., Inc*, 418 F.3d at 545.

**The act**

The act imposes civil liability and a criminal penalty on physicians who perform "dismemberment abortions," defined as,

> dismember[ing] the living unborn child and extract[ing] the unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or a similar instrument that, through the convergence of two rigid levers, slices, crushes, or grasps, or performs any combination of those actions on, a piece of the unborn child's body to cut or rip the piece from the body. The term does not include an abortion that uses suction to dismember the body of an unborn child by sucking pieces of the unborn child into a collection container. The term includes a dismemberment abortion that is used to cause the death of an unborn child and in which suction is subsequently used to extract pieces of the unborn child after the unborn child's death.

Ch. 441, § 6.

> (a) A person may not intentionally perform a dismemberment abortion unless the dismemberment abortion is necessary in a medical emergency.
>
> (b) A woman on whom a dismemberment abortion is performed, an employee or agent acting under the direction of a physician who performs a dismemberment abortion, or a person who fills a prescription or provides equipment used in a dismemberment abortion does not violate Subsection (a).

*Id.*

An exception applies in "a medical emergency," which is defined as

> a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed.

5

Texas Health & Safety Code Ann. § 171.002(3) (West 2017). A physician found to be in violation of the law commits a state jail felony criminal offense punishable by a minimum of 180 days to a maximum of two years in jail and a fine of up to $10,000. Ch. 441, § 6; Tex. Penal Code Ann. § 12.35(a), (b) (West Supp. 2016).

**Laches**

As an initial matter, the State contends that Plaintiffs unreasonably delayed filing this action and therefore, based on the equitable doctrine of laches, should be denied immediate temporary relief. Laches has three interrelated elements: "(1) delay in asserting a right or claim; (2) that the delay was inexcusable; and (3) that undue prejudice resulted from the delay." *Blanco River, L.L.C. v. Green*, 457 Fed. Appx. 431, 441 (5th Cir. 2012) (quotiong *Aramco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982)).

The State contends that it is Plaintiffs' delay in filing this action that forced Plaintiffs to request immediate relief. Additionally, the State asserts that it is prejudiced by the fact that it has "mere weeks to prepare to defend the constitutionality of a duly enacted law, and . . . there are factual issues in this case that require discovery."

Plaintiffs respond that filing this action six weeks after Senate Bill 8 was enacted, is not unreasonable given that such time was necessary for Plaintiffs' to exercise good-faith efforts to investigate the facts and the law regarding the issues raised. Further Plaintiffs argue that timing aside, "the concept of undue prejudice, an essential element of laches, is normally inapplicable when the relief [sought] is prospective." *See Environmental Def. Fund v. Marsh*, 651 F.2d 983, 1005, n. 32 (5th Cir. Unit A July 1981); *see also Teladoc, Inc. v. Texas Med. Bd.*, No. 15-CV0343-RP, 2015 WL 8773509, at *5 (W.D. Tex. Dec. 14, 2015).

The substance of the act first appeared as Senate Bill 415, filed January 5, 2017, and read first to the Texas Senate on January 30, 2017. *See* S.J. 85th R. S. 135 (2017); (SB 415 History, Tex. Legislature Online, available at http://www.capitol.state.tx.us/billlookup/text.aspx?LegSess=85R &Bill=SB415). After passing the Senate, Senate Bill 415 failed to proceed any farther than the State Affairs Committee of the Texas House of Representatives. *See* H.J. 85th Leg., R.S. 2454 (2017). On May 19, 2017, the act, no longer a stand-alone bill but an amendment to Senate Bill 8, Section 6, was laid before the Texas House of Representatives. *See* H.J. 85th Leg., R.S. 3814 (2017); (SB 8 History, Tex. Legislature Online, available at http://www.capitol.state.tx.us/billlookup/text.aspx ?LegSess=85R&Bill=SB8). On May 20, 2017, the House of Representatives passed the act. H.J. 85th Leg., R.S. 3895-96 (2017). On May 26, 2017, the Texas Senate considered the substance of the act as a floor amendment and, with some modifications, passed the act as part of Senate Bill 8 the same day. S.J. 85th Leg., R.S. 5564 (2017). On June 6, 2017 the act was signed into law by the Governor of Texas. On July 20, 2017, Plaintiffs filed this action and requested temporary injunctive relief. On September 1, 2017, the act becomes effective.

Having considered all of the circumstances related to the act and the parties' actions, the court concludes that Plaintiffs have not so unreasonably delayed asserting their claims that they should be denied the opportunity to show they may be entitled to immediate injunctive relief. The court further concludes that the State has not been unduly prejudiced by any such delay. The State made its position clear on the record in open court during an August 4, 2017 status conference, that the State needed limited discovery before a preliminary-injunction hearing, but none before any hearing on the Plaintiffs' request for a temporary restraining order. As the Plaintiffs contend, the State acknowledges, and the court agrees, this is a significant case that deserves a full and fair adjudication

7

with all relevant facts in the record. Although the court is of the opinion that Plaintiffs could have filed this action before July 20 had they been more diligent and that delay until July 20 has unnecessarily compressed the time between the filing of the action and the date the act takes effect, the delay falls in the category of an excusable annoyance. The court concludes that Plaintiffs' request for immediate temporary relief is not barred by the equitable defense of laches.

**Substantial likelihood of success on the merits**

*Legal standard*

Although the Fourteenth Amendment protects a woman's right to choose to terminate her pregnancy prior to viability, government regulation of abortions is allowed so long as it does not impose an undue burden on a woman's ability to choose. *Casey*, 505 U.S. at 878. An undue burden exists if a regulation's "purpose or effect" is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability. *Id.*

Plaintiffs argue "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health,* 136 S.Ct. at 2309 (quoting *Casey*, 505 U.S. at 877). Consequently, a law is constitutionally invalid, if the "purpose or effect" of the law "is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* at 2300 (quoting *Casey*, 505 U.S. at 878).

The State responds arguing that *Whole Woman's Health* addressed abortion regulations when the State's only asserted valid interest was protecting women's health–not as is here where the State's asserted valid interest is respecting the life of the unborn. The State argues that *Whole Woman's Health's* women's-health-based analysis does not apply when challenged abortion laws are based on

8

the State's interest in protecting the life of the unborn.  The State contends that as it only "relies on its interest respecting unborn life and the [act] furthers that interest, courts [are to] consider only whether the [act] imposes a substantial obstacle on abortion access."

Unless *Roe v. Wade*, 410 U.S. 113, 116 (1973), is overruled by the United States Supreme Court, this court, in determining whether a state statute is unconstitutional and violates substantive-due-process rights in the abortion context, will apply the "undue burden" standard developed in *Casey. Id. Casey* describes a unitary standard that applies regardless of a state's asserted interests. 505 U.S. at 877 ("[A] statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be a permissible means of serving its legitimate ends.")  "The rule announced in *Casey*, [] requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S.Ct. at 2309.  "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. Whether an obstacle is substantial–and a burden is therefore undue–must be judged in relation to the benefits that the law provides. *Whole Woman's Health*, 136 S.Ct. at 2309.  Where a law's burdens exceed its benefits, those burdens are, by definition, undue, and the obstacles they embody are, by definition, substantial. *Id.* at 2300, 2309-10, 2312, 2318.

"[T]he [Supreme] Court when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings." *Id.* at 2310.  As *Whole Woman's Health* instructs, a district court in conducting this weighing of the benefits of a law regulating abortion procedures against the burdens of the law, is to

9

consider the evidence in the record, which may include among other things expert evidence, presented in stipulations, depositions, and testimony. *Id.*

***Plaintiffs' declarations in support of their request for temporary restraining order***

In summary, declarations from physicians included with Plaintiffs' motion provide that starting at 15 weeks and sometimes sooner, physicians perform surgical abortions and most often perform a standard D&E procedure before fetal demise. In performing the procedure, the physician dilates the woman's cervix and may use a combination of suction and forceps or other instruments to remove the fetus and other *in utero* materials through the dilated cervical opening.[3] At 15 weeks, because the fetus is larger than the dilated cervical opening, during a standard D&E procedure, separation or disarticulation of fetal tissue usually occurs, as the physician will use instruments in addition to suction to move fetal tissue through the cervix.[4] The evacuation phase takes approximately 10 minutes. The standard D&E procedure is safely performed as an outpatient procedure and is the most common abortion procedure available after 15 weeks of pregnancy.[5]

Other than the standard D&E, the only other abortion procedure available to physicians during the second trimester is induction abortion, in which the physician uses medication to induce labor and delivery of a nonviable fetus. Induction of labor is uncommon both in Texas and nationally.

---

[3] Plaintiffs represent that as is common in the medical literature, gestational age is written as the number of weeks, followed, after a decimal point, by the number of days of the subsequent week. For example, "16.0" represents a gestational age of 16 weeks, 0 days, while "17.6 weeks" represents a gestational age of 17 weeks, 6 days. The court will refer to only complete weeks.

[4] Generally, before 15 weeks physicians do not use the standard D&E procedure because the fetus and all other *in utero* materials will pass through a dilated cervix using only suction.

[5] In Texas, it is only in rare circumstances that an abortion may be performed after 20 weeks. *See* Tex. Health & Safety Code Ann. §§ 171.044, .046 (West 2017).

10

Induction abortions must be performed in a hospital or similar facility that has the capacity to monitor a patient overnight. Induction abortions can last from five hours to three days; are extremely expensive; entail more pain, discomfort, and recovery time for the patient than a standard D&E procedure; and are medically contraindicated for some patients.

Although the standard D&E procedure is not referred to explicitly in the act, Plaintiffs claim the act bans the commonly performed procedure without first causing fetal demise. The act does not use or define the term fetal demise or explain how fetal demise should be determined. Plaintiffs suggest that the fetus would no longer be considered living under the act when asystole–the termination of a heartbeat–occurs.

There is no dispute that the act does not apply to a standard D&E procedure during which the physician–through a separate procedure–causes fetal demise before beginning the evacuation phase of the standard D&E procedure. Although other procedures that cause fetal demise before the evacuation phase of the D&E procedure exist–(1) use of a hypodermic needle to inject a drug called digoxin transabdominally; (2) an injection of potassium chloride directly into the fetal heart; and (3) an umbilical cord transection–Plaintiffs contend none is safe, studied, or medically appropriate. Plaintiffs contend that physicians attempting any of these other procedures before evacuation, would impose risks with no medical benefit to the patient, each of these procedures is untested, has unknown risks, and is of uncertain efficacy. Requiring fetal demise in every instance before starting the evacuation phase of the standard D&E procedure would mandate that physicians experiment on their patients, and many or even most physicians would decline to do so.

Plaintiffs also argue that *Stenberg v. Carhart* is controlling precedent holding that a ban on the standard D&E procedure is an undue burden. 530 U.S. 914, 945-46 (2000). *Stenberg* addressed

11

a Nebraska law which the Court held banned standard D&E procedures and thereby imposed an undue burden upon a woman's right to a previability abortion. *Id.*

> In sum, using this law some present prosecutors and future Attorneys General may choose to pursue physicians who use D&E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment. The result is an undue burden upon a woman's right to make an abortion decision. We must consequently find the statute unconstitutional.

*Id.*

### State's response

The State responds that requiring physicians performing a standard D&E abortion to cause fetal demise before starting the evacuating phase of a standard D&E does not impose any significant health risks or burdens on women. The State suggests there are at least three safe and effective methods of inducing fetal demise–the same three methods Plaintiffs contend would impose risks with no medical benefit to the patient, are untested, have unknown risks, and are of uncertain efficacy. The State contends that each of these possible alternatives, especially the use of digoxin, allow physicians to cause fetal demise before conducting the standard D&E abortion without any significant additional risk to women. The State's response includes several citations to various articles.

### Plaintiffs' reply

By their reply, Plaintiffs maintain their position that each of the three alternatives impose risks with no medical benefit to the patient, each of the procedures is untested, has unknown risks, and is of uncertain efficacy. Plaintiffs raise several issues with the articles the State relies upon. Additionally, Plaintiffs note that causing fetal demise by the State's suggestion of injections of either

12

digoxin or potassium chloride, neither of which is labeled for that purpose, would violate Texas law prohibiting off-label prescription of an abortion-inducing drug. *See* Tex. Health & Safety Code Ann. §§ 171.061(2), .063 (West 2017).

*Analysis*

To satisfy the success-on-the-merits prong for a temporary restraining order, Plaintiffs must show a substantial likelihood of success, not certainty. The undue-burden test courts are required to conduct to evaluate challenged government-imposed abortion restrictions "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S.Ct. at 2309. The court assumes the State's interests are legitimate, however, the State cannot pursue its interests in a way that denies a woman her constitutionally protected right to terminate a pregnancy before the fetus is viable.

The act bans the most common and accepted medical procedure for second-trimester abortions–performance of the standard D&E before fetal demise. The parties disagree about whether the medical options available to a physician to cause fetal demise before performing the evacuation phase of the standard D&E abortion would, as a practical matter, force a woman and her physician to terminate her pregnancy by methods more risky and dangerous to the woman's health than the outlawed procedure.

The State's interest notwithstanding, this court finds no authority for holding that government-mandated medically unnecessary, untested, or a more invasive procedure, or a more complicated and risky procedure with no proven medical benefits over the safe and commonly used banned procedure, is a permissible means of regulating previability abortions. *See e.g., Gonzales v. Carhart*, 550 U.S. 127, 161-65 (2007) (intact D&E or D&X procedure banned under Federal Partial-

13

Birth Abortion Ban Act of 2003 is no undue burden implicitly holding because alternative standard D&E procedure available); *Stenberg*, 530 U.S. at 930 (invalidating Nebraska law because no distinction between standard D&E procedure, which would impose undue burden and D&X procedure which does not impose undue burden). The court finds and concludes that at this juncture and based on the currently thin record in this action, Plaintiffs have shown a substantial likelihood of success on the merits.[6]

**Substantial threat Plaintiffs will suffer irreparable harm**

The second requirement for a temporary restraining order—whether there is a substantial threat that Plaintiffs will suffer irreparable injury if the request for a temporary restraining order is denied—is also satisfied by Plaintiffs. In the absence of a temporary restraining order, as of September 1, 2017, any woman in Texas who is between 15 and 20 weeks pregnant and seeks a previability abortion will no longer have available from a physician in Texas the standard D&E procedure, which as described is a safe one-day abortion procedure that is commonly performed throughout the United States. The act leaves that woman and her physician with abortion procedures that are more complex, risky, expensive, difficult for many women to arrange, and often involve multi-day visits to physicians, and overnight hospital stays.

The court concludes that Plaintiffs have established that absent a temporary restraining order they will suffer irreparable harm by being unable to access the most commonly used and safest

---

[6] The court recognizes that upon Plaintiffs establishing a substantial likelihood that they will succeed on the merits of their claimed constitutional violation, the court need not proceed to review whether Plaintiffs have shown irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ('the loss of [constitutional] freedoms . . . unquestionably constitutes irreparable injury."). The court however, reviews the record for each requirement for a temporary restraining order.

previability-second-trimester-abortion procedure ahead of any substantial constitutional review of the act.

**Threatened injury outweighs any damage the order might cause the State**

Plaintiffs have also satisfied the third requirement for a temporary restraining order–the threatened injury to the Plaintiffs outweighs any damage that the temporary restraining order might cause the State.  In conducting the required undue-burden balancing analysis, the court must weigh the burden the act imposes on abortion access with the benefits the act confers.  *Whole Woman's Health,* 136 S.Ct. at 2309.  As previously mentioned, the State acknowledges that "[t]his is a significant case that deserves a full and fair adjudication with all relevant facts in the record."  Here, the threatened injury–taking away from women in Texas who seek a constitutionally lawful previability second-trimester abortion, the commonly performed and safe standard D&E procedure before fetal demise–outweighs any damage that a *status quo* temporary restraining order might cause the State.

**The order will not disserve the public interest**

The court also finds that Plaintiffs have satisfied the fourth requirement for a temporary restraining order–that a temporary restraining order will not disserve the public interest.  Before the court are weighty constitutional issues.[7]  The Texas Legislature passed the act, which creates new

---

[7] Arkansas, Louisiana, Kansas, Oklahoma, Alabama, Indiana, Mississippi, and West Virginia have enacted state laws similar to the act.  In some of those states courts have granted injunctions enjoining enforcement of the statutes. *See Hopkins v. Jegley*, No. 4:17-CV-00404-KGB _____ F.Supp. 3d _____, 2017 WL 3220445 (E.D. Ark. July 28, 2017) (preliminary injunction granted); *Planned Parenthood of Ind. & Ky., Inc. v. Commissioner*, No. 1:16-CV-01807-TWP-DML, _____ F.Supp. 3d _____, 2017 WL 1197308 (S.D. Ind. Mar. 31, 2017), *appeal docketed*, No 17-1883 (7th Cir. Apr. 27, 2017) (preliminary injunction granted); *West Ala. Women's Ctr. v. Miller*, 217 F.Supp. 3d 1313 (M.D. Ala. 2016), *appeal docketed*, No. 16-17296 (11th Cir. Nov. 29, 2016) (preliminary injunction granted); *Hodes & Nauser v. Schmidt MDs, P.A.*, 368 P.3d 667 (Kan. Ct.

abortion restrictions, without designating the act an emergency. *See* Tex. Const. art. 3, § 39 (legislation designated as emergency and received record vote of two-thirds of each house becomes effective upon the Governor of Texas signing the act; otherwise legislation takes effect at least 90 days after adjournment of session in which enacted). The court concludes that it is in the public interest to preserve the *status quo* and give the parties ample opportunity to develop the record regarding the constitutional questions raised without subjecting Plaintiffs or the public to any of the act's potential harms. The court finds lacking any compelling reason not to maintain the *status quo*. A temporary restraining order, therefore, will not disserve the public interest.

**Conclusion**

Concluding that Plaintiffs prevail in carrying the burden of persuasion on each of the four requirements for a temporary restraining order, the court renders the following:

**IT IS ORDERED** that Plaintiffs' Motion For a Preliminary Injunction or, In the Alternative, a Temporary Restraining Order filed July 20, 2017 (Clerk's Document No. 6) is **GRANTED IN PART** and to the extent that Plaintiffs' request for a temporary restraining order is **GRANTED**.

**IT IS FURTHER ORDERED** that pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendants Ken Paxton, Attorney General of Texas as well as his employees, agents, and successors in office, Defendants Travis County District Attorney Margaret Moore, Bexar County Criminal District Attorney Nicholas LaHood, El Paso District Attorney Jaime Esparza, Dallas County District Attorney Faith Johnson, Tarrant County Criminal District Attorney Sharen Wilson, Hidalgo

---

App. 2016), *pet. rev. granted*, April 11, 2016) (temporary injunction granted); *Nova Health Sys. v. Pruitt*, No. CV-2015-1838, slip op. (Okla. Cty. Dist. Ct. (Oct. 28, 2015) (temporary injunction granted). *See also June Med. Servs. LLC v. Gee*, No. 3:16-CV-0444-BAJ (filed July 1, 2016) (ongoing litigation challenging Louisiana ban on standard D&E procedure).

16

County Criminal District Attorney Ricardo Rodriguez, Jr., McLennan County Criminal District Attorney Abelino Reyna, and Harris County Criminal District Attorney Kim Ogg as well as their employees, agents, and successors in office are **HEREBY ENJOINED** from enforcing those provisions of Senate Bill 8, Section 6, Ch. 441, § 6, 2017 Tex. Sess. Law. Serv. _____ creating Texas Health and Safety Code sections 171.151 through 171.154.

**IT IS FURTHER ORDERED** that Plaintiffs' request for a preliminary injunction is set for hearing at 9:00 a.m. September 14, 2017, in Courtroom 7 Seventh Floor of the United States Courthouse, 501 West 5th Street, Austin, Texas, 78701.

**IT IS FURTHER ORDERED** that no bond is required. The clerk of court shall issue a temporary restraining order in conformity with the law and the terms of this order.

**IT IS FURTHER ORDERED** that unless extended, this temporary restraining order will expire on September 14, 2017, at *4:05* p.m.

**IT IS FINALLY ORDERED** that this case is set for a status conference at 9:30 a.m. September 11, 2017, in Courtroom 7 Seventh Floor of the United States Courthouse, 501 West 5th Street, Austin, Texas, 78701.

SIGNED this *31st* day of August, 2017, at *4:05* p.m.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

# EXHIBIT 4

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

| | |
|---|---|
| Whole Woman's Health, et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.    1:17-CV-00690 |
| Ken Paxton, et al., | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:     Dr. Deshawn Taylor, by and through Colin Proksel, Osborn Maledon, 2929 North Central Avenue, 21st Floor, Phoenix, Arizona 85012-2793

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Osborn Maledon <br> 2929 North Central Avenue, 21st Floor <br> Phoenix, Arizona 85012-2793 | Date and Time: <br> 10/04/2017 10:00 am |
|---|---|

The deposition will be recorded by this method:    Stenography and videography

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 9-20-17

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Defendant
Ken Paxton, Attorney General of Texas _____ , who issues or requests this subpoena, are:
Adam A. Biggs, Office of the Attorney General, 300 W. 15th Street, 11th Floor, Austin, TX 78701; 512-463-2120;
adam.biggs@oag.texas.gov

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:17-CV-00690

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____  on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Counsel agreed to accept service on behalf of Dr. Taylor.

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
        **(i)** is a party or a party's officer; or
        **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
        **(i)** fails to allow a reasonable time to comply;
        **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
        **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

        **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
        **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        **(i)** expressly make the claim; and
        **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 5

# Randy McDonald

| | |
|---|---|
| From: | Hilton, Christopher <Christopher.Hilton@oag.texas.gov> |
| Sent: | Wednesday, September 27, 2017 1:58 PM |
| To: | Randy McDonald |
| Cc: | Colin Proksel; Biggs, Adam; Stephens, Andrew; Martinez, Tamera |
| Subject: | RE: Cause No. 1:17-cv-00690; Whole Woman's Health, et al. v. Ken Paxton, et al. - Subpoena to Testify at Deposition |

I understand, but unfortunately our scheduling order won't allow us to wait that long. A depo date during the week of October 9th might be doable if Dr. Taylor has availability.

Thanks,
Chris

*Christopher D. Hilton*
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
Phone: (512) 475-4120
Fax: (512) 320-0667
Christopher.Hilton@oag.texas.gov

From: Randy McDonald [mailto:rmcdonald@omlaw.com]
Sent: Wednesday, September 27, 2017 3:46 PM
To: Hilton, Christopher <Christopher.Hilton@oag.texas.gov>
Cc: Colin Proksel <cproksel@omlaw.com>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Stephens, Andrew <Andrew.Stephens@oag.texas.gov>; Martinez, Tamera <Tamera.Martinez@oag.texas.gov>
Subject: RE: Cause No. 1:17-cv-00690; Whole Woman's Health, et al. v. Ken Paxton, et al. -Subpoena to Testify at Deposition

Can you agree to October 18th? I'm just trying to reach a consensus on a date that would not require us to go back to the court and ask for a stay in the event that our motion isn't resolved within a couple of weeks.

From: Hilton, Christopher [mailto:Christopher.Hilton@oag.texas.gov]
Sent: Wednesday, September 27, 2017 1:39 PM
To: Randy McDonald
Cc: Colin Proksel; Biggs, Adam; Stephens, Andrew; Martinez, Tamera
Subject: RE: Cause No. 1:17-cv-00690; Whole Woman's Health, et al. v. Ken Paxton, et al. -Subpoena to Testify at Deposition

Randy,

Thank you for the email, and for moving promptly to file your motion. Unfortunately we can't agree to a depo date that far out.

Thanks,
Chris

*Christopher D. Hilton*
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
Phone: (512) 475-4120
Fax: (512) 320-0667
Christopher.Hilton@oag.texas.gov

---

**From:** Randy McDonald [mailto:rmcdonald@omlaw.com]
**Sent:** Wednesday, September 27, 2017 3:29 PM
**To:** Hilton, Christopher <Christopher.Hilton@oag.texas.gov>
**Cc:** Colin Proksel <cproksel@omlaw.com>; Biggs, Adam <Adam.Biggs@oag.texas.gov>
**Subject:** RE: Cause No. 1:17-cv-00690; Whole Woman's Health, et al. v. Ken Paxton, et al. -Subpoena to Testify at Deposition

Chris:

We'd like to file our motion today if possible, but will need to know whether we also need to ask for a stay. Can you let us know if October 25 works as a tentative depo date?

---

**From:** Randy McDonald
**Sent:** Tuesday, September 26, 2017 4:45 PM
**To:** 'Hilton, Christopher'
**Cc:** Colin Proksel; 'Adam.Biggs@oag.texas.gov'
**Subject:** RE: Cause No. 1:17-cv-00690; Whole Woman's Health, et al. v. Ken Paxton, et al. -Subpoena to Testify at Deposition

Chris:

We've spoken to our client, and she can tentatively agree to schedule the deposition for October 25 pending the Court's review of our motion to quash. Would that work?

---

**From:** Hilton, Christopher [mailto:Christopher.Hilton@oag.texas.gov]
**Sent:** Wednesday, September 20, 2017 3:47 PM
**To:** Colin Proksel; Randy McDonald
**Cc:** Biggs, Adam; Martinez, Tamera
**Subject:** Cause No. 1:17-cv-00690; Whole Woman's Health, et al. v. Ken Paxton, et al. -Subpoena to Testify at Deposition

Mr. Proksel and Mr. McDonald,

Thank you for agreeing to accept service of the subpoena for Dr. Taylor, which is attached. Feel free to call me if you'd like to discuss.

Thanks,
Chris

*Christopher D. Hilton*
Assistant Attorney General
General Litigation Division
Office of the Attorney General

P.O. Box 12548
Austin, TX 78711-2548
Phone: (512) 475-4120
Fax: (512) 320-0667
Christopher.Hilton@oag.texas.gov